FILED

2013 NOV 21  PM 3: 14

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2013 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　　　　v.<br><br>ANTHONY DWIGHT BRACKEN,<br>　aka "Fat Boy,"<br>　aka "Unc,"<br>　aka "Daddy-O,"<br>ANDRE BROWN,<br>　aka "Dre,"<br>　aka "Gay Dre,"<br>　aka "King Dre,"<br>ANTHONY WILSON,<br>　aka "Ankey,"<br>ELIGIN GARY HAWKINS,<br>　aka "Che-Che,"<br>　aka "Dub,"<br>JOHNNY RAY THOMAS,<br>NORMAN MANGRAM,<br>　aka "Desvignes Norman,"<br>　aka "Storm,"<br>STAN JONES,<br>FNU LNU,<br>　aka "Nephew,"<br>DESHANE LONDON,<br>　aka "Weeno,"<br>OLLIE LEE WADE,<br>RUEL DUSHON BRANCH,<br>　aka "Reno," | No. CR13-0822<br><br>I N D I C T M E N T<br><br>[21 U.S.C. § 846: Conspiracy<br>to Manufacture, Distribute,<br>and Possess With Intent to<br>Distribute Phencyclidine (PCP),<br>and Illegally Possess a Listed<br>Chemical; 21 U.S.C.<br>§§ 841(a)(1), (b)(1)(A)(iv),<br>(b)(1)(B)(iv), (b)(1)(C):<br>Distribution and Possession<br>with Intent to Distribute PCP;<br>21 U.S.C. §§ 841(c)(1), (c)(2):<br>Illegal Possession of a Listed<br>Chemical; 21 U.S.C.<br>§ 856(a)(1): Maintaining Drug-<br>Involved Premises; 18 U.S.C.<br>§ 924(c)(1)(A): Possession of a<br>Firearm in Furtherance of a<br>Drug Trafficking Crime; 18<br>U.S.C. § 922(g)(1): Felon in<br>Possession of a Firearm/<br>Ammunition; 21 U.S.C. § 853,<br>18 U.S.C. § 924(d), and<br>28 U.S.C. § 2461(c): Criminal<br>Forfeiture] |

```
 1 │ DARRYAL MICHAEL PRESTON,          )
   │ JR.,                              )
 2 │    aka "Smiley,"                  )
   │ MICHAEL ANTHONY BROWN,            )
 3 │    aka "Lock,"                    )
   │ ANDRE BROWN,                      )
 4 │ TIMOTHY AUSTIN,                   )
   │    aka "Cuzo,"                    )
 5 │ DARRELL THOMAS,                   )
   │    aka "D Dog,"                   )
 6 │    aka "Doggie,"                  )
 7 │ EDWARD KEVIN BRANCH,              )
   │    aka "Bo,"                      )
 8 │    aka "Bohart,"                  )
   │ MICHAEL LAMONT JAMES,             )
 9 │    aka "Mike D,"                  )
10 │ ALBERT MADRID,                    )
   │ ALDEN LEVINE JACKSON,             )
11 │    aka "White Boy,"              )
   │ CLARENCE TAYLOR,                  )
12 │ DERRICK COMBS,                    )
13 │    aka "Dirt,"                    )
   │ DELL HESTER,                      )
14 │    aka "Boo Boo,"                 )
   │ KEITH LAMAR McCOMB,               )
15 │    aka "Calico,"                  )
   │ ROBERT PRUDHOLME JR.,             )
16 │    aka "RJ,"                      )
17 │ DANA MILES,                       )
   │ PATRICIA AUBREY,                  )
18 │ BARBARA FLANAGAN,                 )
   │ JOHMEL HOWLETT,                   )
19 │    aka "Chop,"                    )
   │ JAMES GIPSON,                     )
20 │    aka "Big Boo,"                 )
   │ WAYNE LEWIS, and                  )
21 │ RUEL ROBINSON,                    )
22 │              Defendants.          )
23 │                                   )
   │                                   )
```

1    The Grand Jury charges:

2                 GENERAL ALLEGATIONS AND DEFINITIONS

3        At all times relevant to this Indictment:

4        1.    Phencyclidine ("PCP") is a Schedule II controlled

5   substance and is manufactured in a multi-stage process using

6   various materials and equipment.

7        2.    Piperidine is one of the principal ingredients used to

8   produce PCP. Piperidine is a federally-designated List I

9   chemical.   List I chemicals can only be legally possessed,

10  purchased, and sold by persons registered with the United States

11  Drug Enforcement Administration ("DEA"), and cannot lawfully be

12  possessed, purchased, or sold by persons who are not so

13  registered or who intend to use them to manufacture controlled

14  substances.   To circumvent the regulatory restrictions and

15  obtain piperidine for unlawful uses, piperidine can be

16  manufactured using certain non-listed chemicals, including

17  pyridine.

18       3.    As part of the process of manufacturing PCP,

19  piperidine is mixed with other chemicals, including sodium

20  cyanide and distilled water.   Separately, cyclohexanone is mixed

21  with other chemicals, including sodium bisulphite or sodium

22  metabisulphite and distilled water.   These mixtures are then

23  combined and allowed to set.   The resulting crystallized solid

24  product is called piperdinocyclohexane carbonitrile ("PCC").

25  The PCC crystals are then separated and dried.

26       4.    Manufacturing PCP also requires the use of a grignard

27  reagent.   Commonly, clandestine PCP laboratory operators will

28  make a grignard reagent by combining certain chemicals,

1   including bromobenzene, magnesium turnings, ether, and iodine

2   crystals.  This process results in the creation of

3   phenylmagnesium bromide ("PMB").  PMB also can be purchased

4   industrially as manufactured chemical.

5        5.   In the next and final step in the process, the PCC

6   crystals are dissolved, typically in ether, and mixed with the

7   PMB.  This process results in the creation of a mixture or

8   substance containing PCP.

9        6.   The manufacture of PCP is a highly dangerous practice,

10  involving the use and mixing of various highly combustible and

11  toxic chemicals and materials.  Certain chemicals involved in

12  the manufacture of PCP have highly explosive capabilities.  For

13  instance, ether, a chemical used when manufacturing large

14  quantities in the manufacture of PCP, emits flammable vapors

15  and, in an explosion, one gallon of ether could cause a

16  detonation equivalent to several sticks of dynamite.  Likewise,

17  PMB is an exceedingly dangerous compound that can be ignited

18  through any exposure to moisture.  Moreover, the manufacture of

19  PCP results in the emission of highly potent, toxic fumes that

20  can cause significant health problems for anyone in the

21  vicinity, and exposure to such toxic fumes can be particularly

22  widespread in residential communities.  Additionally, the

23  manufacture and storage of PCP can result in toxic discharge

24  causing severe environmental damage and contamination to the

25  area where the PCP is manufactured or stored.

26       7.   The manufacture of PCP requires specialized knowledge

27  and PCP manufacturers generally attempt to keep that knowledge

28  from being disseminated in order to limit the number of PCP

4

manufacturers and maintain the high price of PCP.  Further, the
acquisition of certain PCP-precursor chemicals can be difficult,
as many PCP-precursor chemicals are not widely available to the
public and require business addresses and/or licenses to
acquire.  Because of the highly dangerous and lucrative nature
of PCP-trafficking, individuals who work together in the
manufacture and distribution of PCP often have established
relationships.  Many individuals involved in the manufacture and
distribution of PCP have developed such relationships with other
PCP traffickers through their membership in, or association
with, South Los Angeles street gangs, including the Grape Street
Crips street gang.

    8.   Historically, the principal location in the United
States where PCP is manufactured is the Southern California
area.  After PCP is manufactured, PCP traffickers typically
distribute and transport PCP both within the Southern California
area and to other regions in the United States, where PCP can be
sold at higher prices and for greater profit.

1                         COUNT ONE

2                     [21 U.S.C. § 846]

3 A.   OBJECTS OF THE CONSPIRACY

4       Beginning on a date unknown to the Grand Jury, but no later

5 than in or around December 2008, and continuing to on or about

6 November 21, 2013, in Los Angeles, Riverside, and San Bernardino

7 Counties, within the Central District of California, and

8 elsewhere, defendants ANTHONY DWIGHT BRACKEN, also known as

9 ("aka") "Fat Boy," aka "Unc," aka "Daddy-O" ("BRACKEN"); ANDRE

10 BROWN, aka "Dre," "Gay Dre," "King Dre" ("BROWN"); ANTHONY

11 WILSON, aka "Ankey" ("WILSON"); ELIGIN GARY HAWKINS, aka "Che-

12 Che," aka "Dub" ("HAWKINS"); JOHNNY RAY THOMAS ("THOMAS");

13 NORMAN MANGRAM, aka "Desvignes Norman," aka "Storm" ("MANGRAM");

14 STAN JONES ("JONES"); FIRST NAME UNKNOWN ("FNU") LAST NAME

15 UNKNOWN" ("LNU"), aka "NEPHEW" ("NEPHEW"); DESHANE LONDON, aka

16 "Weeno" ("LONDON"); OLLIE LEE WADE ("WADE"); RUEL DUSHON BRANCH,

17 aka "Reno" ("R. BRANCH"); DARRYAL MICHAEL PRESTON, JR., aka

18 "Smiley" ("PRESTON"); MICHAEL ANTHONY BROWN, aka "Lock" ("M.

19 BROWN"); ANDRE BROWN ("A. BROWN"); TIMOTHY AUSTIN, aka "Cuzo"

20 ("AUSTIN"); DARRELL THOMAS, aka "D Dog," aka "Doggie" ("D.

21 THOMAS"); EDWARD KEVIN BRANCH, aka "Bo," aka "Bohart" ("E.

22 BRANCH"); MICHAEL LAMONT JAMES, aka "Mike D" ("JAMES"); ALBERT

23 MADRID ("MADRID"); ALDEN LEVINE JACKSON, aka "White Boy"

24 ("JACKSON"); CLARENCE TAYLOR ("TAYLOR"); DERRICK COMBS, aka

25 "Dirt" ("COMBS"); DELL HESTER, aka "Boo Boo" ("HESTER"); KEITH

26 LAMAR McCOMB, aka "Calico" ("McCOMB"); ROBERT PRUDHOLME JR., aka

27 "RJ" ("PRUDHOLME JR."); DANA MILES ("MILES"); PATRICIA AUBREY

28 ("AUBREY"); BARBARA FLANAGAN ("FLANAGAN"); JOHMEL HOWLETT, aka

"Chop" ("HOWLETT"); JAMES GIPSON, aka "Big Boo" ("GIPSON");
WAYNE LEWIS ("LEWIS"); and RUEL ROBINSON ("ROBINSON"), and
others known and unknown to the Grand Jury, conspired and agreed
with each other to knowingly and intentionally commit the
following offenses, as defined in Title 21, United States Code,
Sections 841(a)(1), (b)(1)(A)(iv), (c)(1), and (c)(2):

1.   To manufacture at least 100 grams of PCP, or at least
one kilogram of a mixture or substance containing a detectable
amount of PCP, a Schedule II controlled substance, in violation
of Title 21, United States Code, Sections 841(a)(1) and
841(b)(1)(A)(iv);

2.   To distribute at least 100 grams of PCP, or at least
one kilogram of a mixture or substance containing a detectable
amount of PCP, a Schedule II controlled substance, in violation
of Title 21, United States Code, Sections 841(a)(1) and
841(b)(1)(A)(iv);

3.   To possess with intent to distribute at least 100
grams of PCP, or at least one kilogram of a mixture or substance
containing a detectable amount of PCP, a Schedule II controlled
substance, in violation of Title 21, United States Code,
Sections 841(a)(1) and 841(b)(1)(A)(iv);

4.   To possess piperidine, a list I chemical, with intent
to manufacture a controlled substance, that is, PCP, in
violation of Title 21, United States Code, Sections 841(a)(1)
and 841(c)(1); and

5.   To possess piperidine, a list I chemical, knowing and
having reasonable cause to believe that it would be used to
manufacture a controlled substance, that is, PCP, in violation

7

1   of Title 21, United States Code, Sections 841(a)(1) and

2   841(c)(2).

3   B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

4        ACCOMPLISHED

5        The objects of the conspiracy were to be accomplished, in

6   substance, as follows:

7        1.   Defendants BRACKEN, WILSON, NEPHEW, JONES, and

8   MANGRAM, and others known and unknown to the Grand Jury, would

9   manufacture PCP, and provide the PCP to other PCP distributors,

10  including the co-defendants listed herein, for re-distribution

11  to others.

12       2.   Defendants BROWN, WILSON, HAWKINS, THOMAS, WADE,

13  PRESTON, M. BROWN, JAMES, JACKSON, and LEWIS, and others known

14  and unknown to the Grand Jury, would obtain PCP from PCP

15  manufacturers and sources of supply for PCP, and would provide

16  the PCP to PCP distributors, including the co-defendants listed

17  herein, for re-distribution to others.

18       3.   Defendants NEPHEW, WADE, TAYLOR, HESTER, PRUDHOLME

19  JR., and MILES, and others known and unknown to the Grand Jury,

20  would assist defendants BRACKEN, BROWN, WILSON, and HAWKINS, and

21  other PCP manufacturers and distributors, in obtaining and

22  distributing PCP and PCP-precursor chemicals to others known and

23  unknown to the Grand Jury.

24       4.   Defendants BRACKEN, BROWN, WILSON, MANGRAM, and

25  PRUDHOLME JR., and others known and unknown to the Grand Jury,

26  would open, lease, rent, use, maintain, manage, and control

27  locations used (a) to store PCP and chemicals used to

28

8

1  manufacture PCP;  (b) to manufacture PCP; and (c) to distribute

2  PCP.

3      5.   Defendants THOMAS, JONES, LONDON, R. BRANCH, M. BROWN,

4  A. BROWN, AUSTIN, D. THOMAS, JAMES, COMBS, MILES, AUBREY,

5  FLANAGAN, GIPSON, and ROBINSON, and others known and unknown to

6  the Grand Jury, would obtain PCP from defendants BRACKEN, BROWN,

7  WILSON, and HAWKINS, and other PCP distributors, for re-

8  distribution to others in the Southern California area and in

9  other areas of the United States, such as New York, North

10  Carolina, Oklahoma, and Texas.

11      6.   Defendants BROWN, WILSON, HAWKINS, THOMAS, MANGRAM,

12  NEPHEW, WADE, D. THOMAS, E. BRANCH, JAMES, MADRID, JACKSON,

13  McCOMB, and HOWLETT, and others known and unknown to the Grand

14  Jury, would obtain and sell PCP-precursor chemicals, and

15  facilitate and broker PCP-precursor-chemical transactions

16  between drug customers and sources of supply for these precursor

17  chemicals.

18  C.   OVERT ACTS

19      In furtherance of the conspiracy and to accomplish the

20  objects of the conspiracy, defendants BRACKEN, BROWN, WILSON,

21  HAWKINS, THOMAS, MANGRAM, JONES, NEPHEW, LONDON, WADE, R.

22  BRANCH, PRESTON, M. BROWN, A. BROWN, AUSTIN, D. THOMAS, E.

23  BRANCH, JAMES, MADRID, JACKSON, TAYLOR, COMBS, HESTER, McCOMB,

24  PRUDHOLME JR., MILES, AUBREY, FLANAGAN, HOWLETT, GIPSON, LEWIS,

25  and ROBINSON, and others known and unknown to the Grand Jury,

26  committed various overt acts within the Central District of

27  California, and elsewhere, including, but not limited to, the

28  following:

1.   On or about December 15, 2008, defendant HAWKINS, in a telephone conversation using coded language, told a confidential informant posing as a PCP customer that HAWKINS would sell the confidential informant 16 ounces of PCP for $1,200.

2.   On or about December 16, 2008, defendants HAWKINS and WADE distributed to a confidential informant posing as a PCP customer approximately 16 ounces, that is, approximately 453.6 grams, of a mixture or substance containing a detectable amount of PCP, in exchange for approximately $1,200.

3.   On or about March 2, 2009, defendant R. BRANCH, in telephone conversations using coded language, asked defendant HAWKINS for a bank account number to use so that R. BRANCH could provide drug proceeds to HAWKINS, and HAWKINS provided a Bank of America account number in the name of unindicted co-conspirator Q.B. to R. BRANCH in response.

4.   On or about March 2, 2009, defendant R. BRANCH, in a telephone conversation using coded language, told defendant HAWKINS that R. BRANCH was going to send HAWKINS approximately $2,500 in drug proceeds, and R. BRANCH said that if HAWKINS needed more money R. BRANCH could deposit more.

5.   On or about March 2, 2009, defendant HAWKINS, in a telephone conversation using coded language, told unindicted co-conspirator Q.B. that there would be $2,500 in drug proceeds deposited into Q.B.'s bank account.

6.   On or about March 2, 2009, defendants HAWKINS and R. BRANCH, in a telephone conversation using coded language, discussed HAWKINS sending PCP to R. BRANCH in North Carolina,

1  and R. BRANCH said the more PCP HAWKINS could send to R. BRANCH

2  the more money HAWKINS would make.

3      7.  On or about March 3, 2009, defendant HAWKINS, in a

4  telephone conversation using coded language, told defendant R.

5  BRANCH that HAWKINS would be able to send PCP to R. BRANCH that

6  day, and R. BRANCH asked HAWKINS to provide him with the PCP on

7  credit as he had in the past.

8      8.  On or about March 3, 2009, defendants HAWKINS and M.

9  BROWN, in a telephone conversation using coded language,

10  discussed 16-ounce quantities of PCP that HAWKINS agreed to

11  provide to M. BROWN in the past, and M. BROWN said he had a PCP

12  source from whom HAWKINS and he could obtain PCP, and HAWKINS

13  said he was ready to purchase PCP from this source.

14      9.  On or about March 3, 2009, defendant R. BRANCH, in a

15  telephone conversation using coded language, told defendant

16  HAWKINS that he wanted a package of PCP sent to him, and HAWKINS

17  agreed to send the PCP to R. BRANCH and package it tightly.

18      10.  On or about March 3, 2009, defendant A. BROWN, in a

19  telephone conversation using coded language, told defendant

20  HAWKINS that A. BROWN had a PCP customer who wanted "the whole

21  thing," meaning one gallon of PCP, and HAWKINS told A. BROWN to

22  come to his apartment.

23      11.  On or about March 4, 2009, defendant A. BROWN, in a

24  telephone conversation using coded language, told defendant

25  HAWKINS that one of A. BROWN's PCP customers wanted one-and-a-

26  half gallons of PCP.

27      12.  On or about March 4, 2009, defendant HAWKINS, in a

28  telephone conversation using coded language, asked defendant A.

1  BROWN how much A. BROWN had charged his PCP customer for the
2  one-and-a-half gallons of PCP, and, when A. BROWN responded
3  $13,000, HAWKINS expressed surprise and said that $13,000 was
4  around the price for only one gallon of PCP.

5      13.  During the same telephone conversation on or about
6  March 4, 2009, defendant A. BROWN, using coded language, told
7  defendant HAWKINS that A. BROWN thought that his PCP customer
8  would later want two gallons of PCP and, at that point, they
9  could charge the PCP customer $20,000 for the two gallons of
10 PCP.

11     14.  On or about March 4, 2009, defendant R. BRANCH, in a
12 telephone conversation using coded language, discussed with
13 defendant HAWKINS having people pick up a package of PCP that
14 HAWKINS had sent to R. BRANCH.  When R. BRANCH said that he
15 needed more information about the package in order to have it
16 picked up, HAWKINS agreed to provide R. BRANCH with the
17 additional information.

18     15.  On or about March 4, 2009, defendant HAWKINS, in a
19 telephone conversation using coded language, told defendant R.
20 BRANCH that he had sent the package containing PCP via "FedEx."

21     16.  On or about March 5, 2009, defendant HAWKINS, in a
22 telephone conversation using coded language, told defendant R.
23 BRANCH that HAWKINS had sent R. BRANCH 16 ounces of PCP, and R.
24 BRANCH said he was going to send HAWKINS drug proceeds.

25     17.  On or about March 5, 2009, defendant A. BROWN, in a
26 telephone conversations using coded language, told defendant
27 HAWKINS that A. BROWN had a PCP customer who wanted to purchase
28 16 ounces of PCP if it was of good quality, and HAWKINS told A.

1  BROWN that A. BROWN could have someone sample the PCP, which A.

2  BROWN agreed to do.

3      18.  On or about March 5, 2009, defendant HAWKINS, in a

4  telephone conversation using coded language, obtained a bank

5  account number from unindicted co-conspirator T.J. and told T.J.

6  that defendant R. BRANCH was going to deposit approximately

7  $2,500 in drug proceeds for HAWKINS into T.J.'s bank account.

8      19.  On or about March 5, 2009, defendant HAWKINS, in a

9  telephone conversation using coded language, asked defendant R.

10  BRANCH if he had received the PCP shipment, and R. BRANCH

11  responded, "Yeah, it scored, it scored," and HAWKINS said it was

12  high quality PCP.

13      20.  On or about March 6, 2009, defendant HAWKINS, in a

14  telephone conversation using coded language, provided defendant

15  R. BRANCH with a Washington Mutual bank account number in the

16  name of unindicted co-conspirator T.J. in order to deposit drug

17  proceeds, which R. BRANCH agreed to do.

18      21.  On or about March 6, 2009, defendant R. BRANCH, in a

19  telephone conversation using coded language, told defendant

20  HAWKINS that there was no Washington Mutual in North Carolina

21  and that R. BRANCH needed another bank account number.  In a

22  later call on the same day, HAWKINS provided R. BRANCH with a

23  Bank of America account number in the name of unindicted co-

24  conspirator Q.B. to use as a means to deposit drug proceeds.

25      22.  On or about March 7, 2009, defendant PRESTON, in a

26  telephone conversation using coded language, told defendant

27  HAWKINS that PRESTON had access to high quality PCP.

28

23. On or about March 12, 2009, defendants WILSON and MILES, at a PCP-manufacturing site located at 226 Cambridge Street, in Long Beach, California, possessed with intent to distribute approximately 7 gallons, that is, approximately 25.9 kilograms, of a mixture or substance containing a detectable amount of PCP.

24. On or about March 12, 2009, defendants WILSON and MILES, at a PCP-manufacturing site at 226 Cambridge Street, in Long Beach, California, possessed numerous PCP-precursor chemicals and other items associated with the manufacture and distribution of PCP, including, among other items, two gallons of hydrochloric acid, five pounds of sodium hydroxide, two 32-gallon trash bins, two five-gallon buckets, several empty juice bottles, "Magic Scent" odor remover, and three packages of rubber gloves.

25. On or about March 14, 2009, defendant M. BROWN, in a telephone conversation using coded language, told defendant HAWKINS that M. BROWN's PCP source was in the process of making PCP and that HAWKINS should be ready soon to come with M. BROWN to obtain the PCP so that HAWKINS and M. BROWN did not look bad.

26. On or about March 15, 2009, defendant M. BROWN, in a telephone conversation using coded language, told defendant HAWKINS that his PCP source had made PCP yesterday and that the PCP would be ready for pick up soon, and HAWKINS said he was on his way to M. BROWN's location so that he and M. BROWN could obtain the PCP.

27. On or about March 16, 2009, defendant MANGRAM, in a telephone conversation using coded language, told defendant

14

1  HAWKINS and an unindicted co-conspirator that he was trying to
2  manufacture PCP in order to get the PCP to them, and HAWKINS
3  agreed to inquire about obtaining a PCP-precursor chemical for
4  MANGRAM so that MANGRAM could make the PCP.

5      28.  On or about March 19, 2009, defendants HAWKINS and M.
6  BROWN, in a telephone conversation using coded language,
7  discussed the fact that defendant WILSON was "on the news and in
8  the newspaper" after having been caught manufacturing PCP in
9  Long Beach, California.

10     29.  On or about March 21, 2009, defendant HAWKINS, in a
11 telephone conversation using coded language, told defendant
12 PRESTON that HAWKINS needed eight ounces of PCP, and PRESTON
13 agreed to provide the PCP to HAWKINS.

14     30.  On or about March 23, 2009, defendant LONDON, in a
15 telephone conversation using coded language, told defendant
16 HAWKINS that he needed three units of PCP, and HAWKINS said he
17 would have the PCP in an hour.

18     31.  On or about March 23, 2009, defendant HAWKINS, in a
19 telephone conversation using coded language, asked if defendant
20 LONDON was ready with the money for the PCP, and LONDON said as
21 long as the PCP was of good quality it would be sold.

22     32.  On or about March 23, 2009, defendant HAWKINS, in
23 telephone conversations using coded language, ordered "an
24 eight," meaning eight ounces of PCP, from defendant PRESTON, and
25 PRESTON said he had the PCP and agreed to provide it to HAWKINS.

26     33.  On or about March 23, 2009, defendant HAWKINS, in a
27 telephone conversation using coded language, told defendant
28 PRESTON that HAWKINS needed three gallons of PCP in two hours.

1  In a later call on the same day, PRESTON told HAWKINS that he
2  had the three gallons of PCP for HAWKINS.

3      34.  On or about March 23, 2009, defendant M. BROWN, in a
4  telephone conversation using coded language, told defendant
5  HAWKINS that M. BROWN had a large amount of high quality PCP in
6  his possession, and M. BROWN said he wanted to meet with HAWKINS
7  so that HAWKINS could test the quality of the PCP and obtain
8  some of the PCP.

9      35.  On or about March 24, 2009, defendant MANGRAM, in a
10 telephone message using coded language, told defendant HAWKINS
11 to check with defendant BROWN to see if BROWN was able to
12 acquire a PCP-precursor chemical for MANGRAM to use to
13 manufacture PCP.

14     36.  On or about March 26, 2009, defendants HAWKINS and
15 MANGRAM, in a telephone conversation using coded language,
16 discussed the fact that MANGRAM had one of the PCP-precursor
17 chemicals he needed to manufacture PCP, but needed a business
18 address in order to have another necessary chemical shipped to
19 him, and HAWKINS agreed to obtain a business address they could
20 use so HAWKINS could acquire the PCP-precursor chemical.

21     37.  On or about March 26, 2009, defendant HAWKINS, in a
22 telephone conversation using coded language, told defendant M.
23 BROWN to come and meet him so that HAWKINS could provide M.
24 BROWN with one-and-a-half gallons of PCP, and M. BROWN said he
25 would go to HAWKINS's location.

26     38.  On or about March 26, 2009, defendant M. BROWN, in a
27 telephone conversation using coded language, told defendant
28 HAWKINS that he was en route to HAWKINS's location to pick up

1  the one-and-a-half gallons of PCP, and HAWKINS told M. BROWN to

2  just get there.

3    39.  On or about March 27, 2009, defendants HAWKINS and

4  WADE, in a telephone conversation using coded language,

5  discussed selling PCP to customers who were waiting for the PCP.

6    40.  On or about March 28, 2009, defendants HAWKINS and M.

7  BROWN, in telephone conversations using coded language,

8  discussed ordering three gallons of PCP, and HAWKINS told M.

9  BROWN that HAWKINS's PCP source had the three gallons of PCP

10  waiting.

11    41.  On or about March 29, 2009, defendant HAWKINS, in

12  telephone conversations using coded language, asked defendant

13  MANGRAM for the name of a PCP-precursor chemical MANGRAM was

14  requesting in order to make PCP, and MANGRAM said he needed

15  "ruthenium," a chemical used in the manufacture of PCP.  MANGRAM

16  added that he had the other ingredients he needed to make the

17  PCP, but needed ruthenium, and HAWKINS agreed to try to find

18  ruthenium for MANGRAM.

19    42.  On or about March 29, 2009, defendant HAWKINS, in a

20  telephone conversation using coded language, told defendant WADE

21  that HAWKINS was going to meet with PCP customers in the Watts

22  area of Los Angeles, and WADE said he would go to his PCP stash

23  location to obtain PCP.

24    43.  During the same telephone conversation on or about

25  March 29, 2009, defendants HAWKINS and WADE, using coded

26  language, discussed obtaining PCP-precursor chemicals, and WADE

27  told HAWKINS that another individual assisted him in obtaining

28  PCP-precursor chemicals.

44.   On or about March 30, 2009, defendant HAWKINS, in a telephone conversation using coded language, asked defendant WADE about obtaining a PCP-precursor chemical, and WADE said he was looking for it.

45.   On or about March 30, 2009, defendant HAWKINS, in a telephone conversation using coded language, told defendant WADE that HAWKINS' PCP customers were ready, and WADE said he would be there to provide the PCP.

46.   On or about March 30, 2009, defendant M. BROWN, in a telephone conversation using coded language, told defendant HAWKINS that M. BROWN had PCP available for HAWKINS, and M. BROWN told HAWKINS to be ready to pick up the PCP.

47.   On or about April 1, 2009, defendants HAWKINS and WADE, in a series of telephone conversations using coded language, discussed WADE's efforts to obtain ruthenium for HAWKINS to provide to defendant MANGRAM, and WADE asked HAWKINS about the spelling of "ruthenium."

48.   On or about April 1, 2009, defendant WADE, in telephone conversations using coded language, told defendant HAWKINS that WADE had found four different types of ruthenium and that the ruthenium was "expensive."

49.   On or about April 1, 2009, defendant HAWKINS, in telephone conversations using coded language, asked defendant MANGRAM to spell out "ruthenium" for him, which MANGRAM did, and MANGRAM clarified that, for purposes of making PCP, he wanted the "compound" ruthenium oxide (RuO2), a chemical compound used in the manufacture of PCP.

50.   On or about April 1, 2009, defendant HAWKINS, in a telephone conversation using coded language, clarified for defendant WADE that defendant MANGRAM needed ruthenium oxide, or "RuO2."

51.   On or about April 1, 2009, defendant WADE, in a telephone conversation using coded language, told defendant HAWKINS that WADE was able to obtain ruthenium oxide.

52.   On or about April 2, 2009, defendant HAWKINS, in a telephone conversation using coded language, asked defendant MANGRAM how much ruthenium oxide MANGRAM wanted, and MANGRAM said that he wanted 50 grams.  HAWKINS further told MANGRAM that the ruthenium oxide would cost $100 for under a gram, and MANGRAM asked HAWKINS to see what the cost would be for 25 grams of ruthenium oxide.

53.   On or about April 2, 2009, defendant HAWKINS, in telephone conversations using coded language, gave defendant MANGRAM the telephone number for an unindicted co-conspirator who could acquire the ruthenium oxide that MANGRAM wanted in order to make PCP, and MANGRAM later said he had spoken with the unindicted co-conspirator about obtaining ruthenium oxide.

54.   On or about April 2, 2009, defendant WADE, in a telephone conversation using coded language, told defendant HAWKINS that WADE needed a "commercial address" in order to obtain ruthenium oxide at a good price, and WADE said he would have to use his business license.

55.   On or about April 3, 2009, defendant WADE, in a telephone conversation using coded language, told defendant HAWKINS that he would be able to obtain the ruthenium oxide on

1   Monday during "business hours," and that WADE had "all the

2   paperwork."

3       56.   On or about April 4, 2009, defendant HAWKINS, in a

4   telephone conversation using coded language, told defendant WADE

5   that HAWKINS had drug proceeds to provide to WADE.

6       57.   On or about April 7, 2009, defendant HAWKINS, in a

7   telephone conversation using coded language, told defendant WADE

8   that HAWKINS needed two gallons of PCP to sell to PCP customers,

9   and WADE agreed to obtain the PCP.

10      58.   On or about April 8, 2009, defendant WADE, in a

11  telephone message using coded language, told defendant HAWKINS

12  that he had two gallons of PCP for HAWKINS in his truck.

13      59.   On or about July 23, 2009, defendant HAWKINS, in a

14  telephone conversation using coded language, told defendant

15  MANGRAM that HAWKINS was going to be participating in the

16  manufacture of PCP.

17      60.   On or about July 24, 2009, defendants HAWKINS and E.

18  BRANCH, in a telephone conversation using coded language,

19  discussed piperidine that HAWKINS had available for sale, and

20  HAWKINS said that E. BRANCH could make $500 to $1,000 if he

21  assisted in selling the piperidine, and E. BRANCH agreed to look

22  for a drug customer who needed piperidine.

23      61.   On or about July 24, 2009, defendant HAWKINS, in a

24  series of telephone conversations using coded language, asked

25  defendant JAMES for a gallon of PCP, and JAMES said he could get

26  the gallon of PCP for HAWKINS.

27      62.   On or about July 25, 2009, defendant MANGRAM, in a

28  telephone conversation using coded language, told defendant

HAWKINS to contact defendant BROWN regarding gallons of piperidine that HAWKINS and MANGRAM were trying to sell, and HAWKINS said he would do so.

63. On or about July 25, 2009, defendant BROWN, in a telephone conversation using coded language, asked defendant HAWKINS if he still had piperidine available, and HAWKINS said he did.

64. During the same telephone conversation on or about July 25, 2009, defendant BROWN, using coded language, told defendant HAWKINS that BROWN's drug customers wanted four gallons of piperidine.

65. On or about July 25, 2009, defendant HAWKINS, in a telephone conversation using coded language, told defendant MANGRAM to come to HAWKINS's location because defendant BROWN said his drug customers would be purchasing the gallons of piperidine that HAWKINS and MANGRAM were trying to sell, and MANGRAM said he would be there.

66. On or about July 25, 2009, defendant BROWN, in a telephone conversation using coded language, confirmed with defendant HAWKINS that HAWKINS was in possession of piperidine.

67. On or about July 27, 2009, defendants HAWKINS and MANGRAM, in telephone conversations using coded language, discussed having MANGRAM bring an additional gallon of piperidine to HAWKINS's location.

68. On or about July 28, 2009, defendant HAWKINS, in a telephone conversation using coded language, told defendant E. BRANCH that he still had piperidine available for sale, and E.

1  BRANCH agreed to come to HAWKINS's location to see the

2  piperidine in order to facilitate its sale.

3      69.  On or about July 28, 2009, defendants HAWKINS and

4  JAMES, in a telephone conversation using coded language,

5  discussed 16 ounces of PCP and drug proceeds that defendant

6  LONDON owed to HAWKINS.

7      70.  On or about August 1, 2009, defendant MANGRAM, in a

8  telephone conversation using coded language, asked defendant

9  HAWKINS to obtain three units of PCP-precursor chemicals, and

10  HAWKINS said he would look into it.

11      71.  On or about August 3, 2009, defendant MANGRAM, in a

12  telephone conversation using coded language, told defendant

13  HAWKINS that MANGRAM wanted to obtain the three units of PCP-

14  precursor chemicals that they had previously discussed "today or

15  tomorrow," and HAWKINS said they would be ready.

16      72.  On or about August 3, 2009, defendants HAWKINS and D.

17  THOMAS, in a telephone conversation using coded language,

18  discussed gallons of piperidine, a PCP-precursor chemical, that

19  HAWKINS had available to sell.

20      73.  On or about August 4, 2009, defendant MANGRAM, in

21  telephone conversations using coded language, told defendant

22  HAWKINS that MANGRAM needed three units of ether, a chemical

23  used in the manufacture of PCP, and HAWKINS said he would work

24  on obtaining it.

25      74.  On or about August 4, 2009, defendants HAWKINS and

26  MANGRAM, in telephone conversations using coded language,

27  discussed the quality of piperidine that they had sold to a drug

28  customer.

1    75.  On or about August 4, 2009, defendant MANGRAM was at

2  his PCP and PCP-precursor chemical manufacturing site located at

3  10117 East Avenue R-12, in Littlerock, California.

4    76.  On or about August 4, 2009, defendants HAWKINS and D.

5  THOMAS, in a telephone conversation using coded language,

6  discussed the lowest price for which HAWKINS was willing to sell

7  piperidine to D. THOMAS's drug customer.

8    77.  On or about August 4, 2009, defendant D. THOMAS, in a

9  telephone conversation using coded language, told defendant

10  HAWKINS that his drug customer had $5,500 available to purchase

11  piperidine from HAWKINS.

12    78.  On or about August 6, 2009, defendant JAMES, in a

13  telephone conversation using coded language, told defendant

14  HAWKINS that he needed 16 ounces of PCP, and JAMES gave HAWKINS

15  directions on where to deliver the PCP, and HAWKINS agreed to

16  deliver the PCP.

17    79.  On or about August 6, 2009, defendant D. THOMAS, in a

18  telephone conversation using coded language, told defendant

19  HAWKINS that D. THOMAS had drug customers interested in

20  HAWKINS's piperidine, and D. THOMAS asked whether the piperidine

21  was of high quality.

22    80.  On or about August 6, 2009, defendant D. THOMAS, in a

23  telephone conversation using coded language, told defendant

24  HAWKINS that his drug customers wanted HAWKINS's piperidine and

25  that D. THOMAS would be in contact with HAWKINS.

26    81.  On or about August 7, 2009, defendants HAWKINS and

27  PRESTON, in a telephone conversation using coded language,

28

23

1  discussed HAWKINS's desire to obtain a "whole G," meaning one
2  gallon of PCP.

3      82.  On or about August 7, 2009, defendant MANGRAM, in a
4  telephone conversation using coded language, told defendant
5  BROWN that MANGRAM had two gallons of piperidine available for
6  purchase, and BROWN said he would inquire with his drug
7  customers to determine if anyone was interested in purchasing
8  this piperidine.

9      83.  On or about August 11, 2009, defendant PRESTON, in a
10  telephone conversation using coded language, told defendant
11  HAWKINS that PRESTON had a gallon of PCP available on 102nd
12  Street, and HAWKINS confirmed his interest in obtaining the PCP.

13      84.  On or about August 12, 2009, defendant JAMES, in a
14  telephone conversation using coded language, told defendant
15  HAWKINS that JAMES might need 16 ounces of PCP, and HAWKINS
16  agreed to provide the PCP to JAMES.

17      85.  On or about August 12, 2009, defendants HAWKINS and
18  MANGRAM, in a telephone conversation using coded language,
19  discussed types of piperidine that certain drug customers
20  wanted, and MANGRAM told HAWKINS to contact him once their
21  piperidine had been sold.

22      86.  On or about August 12, 2009, defendant JAMES, in a
23  telephone conversation using coded language, asked defendant
24  HAWKINS how much he charged for piperidine, and HAWKINS said the
25  piperidine would cost $4,000 per five-gallon container.

26      87.  On or about August 14, 2009, defendant LONDON, in a
27  telephone conversation using coded language, asked defendant

28

1  HAWKINS how much he was charging for piperidine, and HAWKINS

2  said $4,000 per five-gallon container.

3      88.  During the same telephone conversation on or about

4  August 14, 2009, defendant LONDON, using coded language, told

5  defendant HAWKINS that LONDON was going to give HAWKINS's

6  telephone number to an unindicted co-conspirator who was

7  interested in purchasing gallons of piperidine from HAWKINS.

8      89.  On or about August 14, 2009, defendant HAWKINS, in a

9  telephone conversation using coded language, spoke to the

10  unindicted co-conspirator referred by defendant LONDON about

11  picking up piperidine.

12      90.  On or about August 15, 2009, defendant HAWKINS, in a

13  telephone conversation using coded language, arranged to meet in

14  the afternoon with the unindicted co-conspirator referred by

15  defendant LONDON who was going to pick up piperidine.

16      91.  On or about August 17, 2009, defendant HAWKINS, in a

17  telephone conversation using coded language, asked defendant

18  JAMES for 16 ounces of PCP, and JAMES said the PCP would cost

19  $1,250 and that JAMES would check with defendant LONDON to see

20  how quickly JAMES could obtain the PCP.

21      92.  On or about August 18, 2009, defendant MANGRAM and

22  others known and unknown to the Grand Jury possessed at their

23  PCP and PCP-precursor chemical manufacturing site located at

24  10117 East Avenue R-12, in Littlerock, California, a

25  Hydrogenator, which is a machine used to mix pyridine and

26  hydrogen to make piperidine, a List I chemical used in the

27  manufacture of PCP.

28

93. On or about August 18, 2009, defendant MANGRAM and others known and unknown to the Grand Jury possessed at their PCP and PCP-precursor chemical manufacturing site located at 10117 East Avenue R-12, in Littlerock, California, PCP-precursor chemicals, including approximately 255 grams of piperidine and 8.47 kilograms of pyridine. The PCP-precursor chemicals possessed by MANGRAM were capable of producing approximately 7.8 gallons, or 28.8 kilograms, of a mixture or substance containing a detectable amount of PCP.

94. On or about January 4, 2011, defendants BROWN, HAWKINS, and HESTER possessed and packaged approximately 64 ounces, that is, approximately 1.8 kilograms, of a mixture or substance containing a detectable amount of PCP that they intended to ship via U.S. Mail to Coppell, Texas.

95. On or about January 4, 2011, defendant BROWN caused to be shipped approximately 64 ounces, that is, approximately 1.8 kilograms, of a mixture or substance containing a detectable amount of PCP via U.S. Mail to Coppell, Texas.

96. On or about January 20, 2011, defendant BROWN, in a telephone conversation using coded language, told a confidential informant posing as a PCP customer that BROWN would begin manufacturing PCP at approximately 5:30 p.m. that day.

97. On or about January 21, 2011, defendant BROWN, in a telephone conversation using coded language, agreed to sell approximately 32 ounces of PCP the following week to a confidential informant posing as a PCP customer.

98. On or about January 26, 2011, defendant HESTER, in a conversation using coded language, told a confidential informant

posing as a PCP customer that HESTER would meet the confidential
informant at defendant BROWN's apartment in order to carry out a
32-ounce PCP transaction.

99.   On or about January 26, 2011, defendants BROWN and
HESTER, and others known and unknown to the Grand Jury,
distributed to a confidential informant posing as a PCP customer
approximately 32 ounces, that is, approximately 907.2 grams, of
a mixture or substance containing a detectable amount of PCP.

100. On or about March 19, 2011, defendant TAYLOR, who was
transporting approximately 96 ounces of PCP, told a confidential
informant in a telephone conversation using coded language that
TAYLOR was traveling by bus to New Mexico via El Paso, Texas.

101. On or about March 19, 2011, defendant TAYLOR possessed
in El Paso, Texas, approximately 96 ounces, that is,
approximately 2.7 kilograms, of a mixture or substance
containing a detectable amount of PCP that TAYLOR was
transporting via bus.

102. On or about March 19, 2011, defendant TAYLOR, in a
telephone conversation using coded language, told defendant
BROWN that TAYLOR was in El Paso, Texas, and police officers
were boarding the bus in which he was transporting PCP.

103. During the same telephone conversation on or about
March 19, 2011, defendant TAYLOR, using coded language, told
defendant BROWN that TAYLOR had placed the bag containing the
approximately 96 ounces of PCP that he was transporting via bus
under another person's bus seat.

104. During the same telephone conversation on or about
March 19, 2011, defendant BROWN, using coded language, confirmed

1   with defendant TAYLOR that TAYLOR had not been sitting near the

2   approximately 96 ounces of PCP that TAYLOR was transporting via

3   bus.

4        105. During the same telephone conversation on or about

5   March 19, 2011, defendant BROWN told a police officer, who was

6   investigating defendant TAYLOR's transportation of approximately

7   96 ounces of PCP via bus, that TAYLOR was BROWN's nephew.

8        106. On or about March 19, 2011, defendant BROWN, in a

9   telephone message using coded language, told defendant HAWKINS

10  to contact him because the police had asked him questions on

11  defendant TAYLOR's telephone, and BROWN said that the police had

12  probably approached TAYLOR because TAYLOR looked paranoid.

13       107. On or about March 19, 2011, defendant BROWN, in a

14  telephone conversation using coded language, asked defendant

15  TAYLOR what had happened with the police officers' inspection of

16  the bus in which TAYLOR was transporting approximately 96 ounces

17  of PCP, and TAYLOR said that officers had seized the PCP but

18  that he had not been arrested.

19       108. On or about March 19, 2011, defendant HAWKINS, in a

20  telephone conversation using coded language, told defendant

21  BROWN that HAWKINS did not understand how police officers had

22  discovered the approximately 96 ounces of PCP that defendant

23  TAYLOR had been transporting, and HAWKINS said that he had

24  spoken to TAYLOR earlier and TAYLOR told HAWKINS that officers

25  had seized the PCP.

26       109. On or about March 21, 2011, defendant AUSTIN, in a

27  telephone conversation using coded language, asked defendant

28  BROWN if BROWN had obtained PCP for him and when the PCP would

1  be sent to AUSTIN's location in Texas, and BROWN said he would

2  look into it.

3      110. On or about March 21, 2011, defendant BROWN, in a

4  telephone conversation using coded language, asked defendant

5  HAWKINS when HAWKINS would have drug proceeds to pay to BROWN,

6  and HAWKINS said he did not know when he would have the money

7  because he had "no job. I'm a hustler," so the drug proceeds

8  could become available at any time.

9      111. On or about March 22, 2011, defendant GIPSON, in a

10 telephone conversation using coded language, told defendant

11 BROWN that GIPSON was looking for a quantity of PCP to sell to

12 drug customers and said he wanted a sample of PCP to provide to

13 the customers, and BROWN agreed to look for a quantity of PCP

14 and a sample of PCP for GIPSON.

15     112. During the same telephone conversation on or about

16 March 22, 2011, defendant GIPSON, using coded language, agreed

17 to give defendant BROWN $200 in exchange for BROWN locating PCP

18 for GIPSON to sell to his drug customers.

19     113. On or about March 23, 2011, defendant THOMAS, in a

20 telephone conversation using coded language, told defendant

21 BROWN that defendant BRACKEN wanted piperidine in order to

22 manufacture PCP, and THOMAS said that BRACKEN wanted "factory"

23 grade piperidine.

24     114. On or about March 23, 2011, defendant BROWN, in a

25 telephone conversation using coded language, told defendant

26 GIPSON that BROWN had located PCP for GIPSON, and GIPSON said he

27 had found PCP from another source, but agreed to provide BROWN

28

with drug proceeds to compensate BROWN for locating PCP for
GIPSON.

115. On or about March 23, 2011, defendant WILSON, in a
telephone conversation using coded language, asked defendant
BROWN for five gallons of piperidine, and BROWN said that the
piperidine would cost $5,000 per five-gallon container and that
BROWN was looking for piperidine for another drug customer as
well.

116. On or about March 23, 2011, defendant BROWN, in a
telephone conversation using coded language, told defendant
HOWLETT that BROWN wanted to obtain a PCP-precursor chemical,
and HOWLETT put BROWN in contact with unindicted co-conspirator
L.W.

117. On or about March 24, 2011, defendant BROWN and
unindicted co-conspirator L.W., in telephone conversations
using coded language, discussed obtaining a PCP-precursor
chemical, and L.W. said that defendant HOWLETT had told him
about what BROWN was looking for.

118. On or about March 24, 2011, defendant THOMAS, in a
telephone conversation using coded language, told defendant
BROWN that defendant BRACKEN wanted six five-gallon containers
of ether, and BROWN said the ether would probably be ready by
the weekend.

119. On or about March 24, 2011, defendant BROWN, in a
telephone conversation using coded language, told defendant
PRUDHOLME JR. to purchase starter fluid from AutoZone that would
be used to prepare six five-gallon containers of ether, and

1   BROWN and PRUDHOLME JR. discussed how many cans of starter fluid

2   PRUDHOLME JR. would need to purchase.

3       120. On or about March 25, 2011, defendant THOMAS, in a

4   telephone conversation using coded language, told defendant

5   BROWN that defendant BRACKEN changes his telephone number once a

6   month.

7       121. On or about March 25, 2011, defendants BROWN and

8   TAYLOR, in a telephone conversation using coded language,

9   discussed obtaining numerous cans of engine starter fluid, which

10  contains ether, a PCP-precursor chemical, from various AutoZone

11  locations in South Los Angeles.

12      122. On or about March 25, 2011, defendant BROWN, in a

13  telephone conversation using coded language, told defendant

14  TAYLOR that BROWN was at an AutoZone location on Compton

15  Boulevard purchasing cans of starter fluid.

16      123. On or about March 25, 2011, defendant MADRID, in a

17  telephone conversation using coded language, offered to supply

18  defendant BROWN with PCP-precursor chemicals, and BROWN said he

19  would inquire with other PCP traffickers to see if they needed

20  PCP-precursor chemicals.

21      124. On or about March 25, 2011, defendant THOMAS, in a

22  telephone conversation using coded language, told defendant

23  BROWN that defendant BRACKEN would be delayed in picking up the

24  six five-gallon containers of ether because BRACKEN's son was in

25  the hospital, and THOMAS said BRACKEN needed piperidine as well.

26      125. On or about March 25, 2011, defendant BROWN, in a

27  telephone conversation using coded language, told defendant

28  PRUDHOLME JR. that defendant BRACKEN's son was in the hospital

1  so BRACKEN would be delayed in obtaining the six five-gallon

2  containers of ether, and PRUDHOLME JR. said he would leave the

3  two five-gallon containers of ether that PRUDHOLME JR. had

4  already prepared in the garage at 840 W. 127th Place, in

5  Compton, California.

6      126. During the same telephone conversation on or about

7  March 25, 2011, defendant BROWN, using coded language, told

8  defendant PRUDHOLME JR. that they would prepare the rest of the

9  five-gallon containers of ether on Sunday, March 31, 2011.

10     127. On or about March 26, 2011, defendant BROWN, in a

11  telephone conversation using coded language, told defendant

12  HESTER that people were saying that defendant TAYLOR was a

13  "snitch" after police officers in El Paso, Texas, had seized the

14  96 ounces of PCP that TAYLOR had been transporting.

15     128. During the same telephone conversation on or about

16  March 26, 2011, defendant BROWN, using coded language, told

17  defendant TAYLOR that BROWN could no longer hang out with TAYLOR

18  because people were saying TAYLOR was a "snitch" after police

19  seized the 96 ounces of PCP that TAYLOR had been transporting,

20  and TAYLOR said he was going to talk with defendant HAWKINS

21  about why people were saying TAYLOR was a "snitch."

22     129. On or about March 28, 2011, defendant BROWN, in a

23  telephone conversation using coded language, asked defendant

24  McCOMB to acquire 20 pounds of sodium metabisulphite for him,

25  and McCOMB said he would do so.

26     130. On or about March 28, 2011, defendant BROWN, in a

27  telephone conversation using coded language, told defendant

28  THOMAS that BROWN was going to meet with defendant McCOMB to

1  obtain 20 pounds of sodium metabisulphite for THOMAS and

2  defendant BRACKEN.

3      131. During the same telephone conversation on or about

4  March 28, 2011, defendant THOMAS, using coded language, asked

5  defendant BROWN about acquiring piperidine, and BROWN said he

6  was working on it.

7      132. On or about March 29, 2011, defendant BROWN, in a

8  telephone conversation using coded language, told defendant

9  THOMAS that BROWN wanted a gallon of PCP for the next day.

10     133. On or about March 29, 2011, defendant BROWN, in a

11  telephone conversation using coded language, told defendant

12  AUSTIN, who was visiting the Los Angeles area, to meet him

13  because BROWN's PCP suppliers were ready, and AUSTIN said he

14  would see BROWN.

15     134. On or about March 29, 2011, defendants BROWN and

16  WILSON, in a telephone conversation using coded language,

17  discussed looking for five gallons of piperidine.

18     135. On or about March 30, 2011, defendant WILSON, in a

19  telephone conversation using coded language, discussed with

20  defendant BROWN trying to get money in order to purchase

21  chemicals for manufacturing PCP.

22     136. On or about March 31, 2011, defendants BROWN and

23  PRUDHOLME JR., in a telephone conversation using coded language,

24  discussed preparing the remainder of the six five-gallon

25  containers of ether ordered by defendant BRACKEN.

26     137. On or about March 31, 2011, defendants BROWN and

27  PRUDHOLME JR., and others known and unknown to the Grand Jury,

28  possessed inside a garage located at 840 W. 127th Place, in

1  Compton, California, PCP-precursor chemicals, namely,

2  approximately 15 gallons of ether contained inside three five-

3  gallon containers.

4      138. On March 31, 2011, defendant PRUDHOLME JR., in a

5  telephone conversation using coded language, told defendant

6  BROWN that officers had searched the garage located at 840 W.

7  127th Place, in Compton, California, and seized their containers

8  of ether.

9      139. During the same telephone conversation on or about

10 March 31, 2011, defendant PRUDHOLME JR., using coded language,

11 told defendant BROWN that, at the time officers seized their

12 ether, PRUDHOLME JR. had already prepared half of the six five-

13 gallon containers of ether ordered by defendant BRACKEN, and

14 BROWN said the ether represented a "nice paycheck."

15     140. On or about March 31, 2011, defendant THOMAS, in a

16 telephone conversation using coded language, told defendant

17 BROWN that THOMAS had located two gallons of PCP for BROWN, and

18 BROWN said he only needed one gallon of PCP at that time.

19     141. On or about March 31, 2011, defendants BROWN and E.

20 BRANCH, in a telephone conversation using coded language,

21 discussed having BROWN meet with E. BRANCH's PCP suppliers in

22 order to obtain PCP, and E. BRANCH told BROWN that he should

23 bring someone to sample the quality of the PCP.

24     142. On or about April 1, 2011, defendant BROWN, in

25 telephone conversations using coded language, told defendant E.

26 BRANCH that BROWN wanted to wait for E. BRANCH to be available

27 in order to carry out the PCP transaction, and E. BRANCH said

28

1    that hopefully he would be in possession of the PCP by that

2    time.

3          143. On or about April 1, 2011, defendant BROWN, in a

4    telephone conversation using coded language, asked defendant

5    HESTER if HESTER was able to purchase ether and HESTER said yes.

6          144. On or about April 1, 2011, defendant McCOMB, in a

7    telephone conversation using coded language, told defendant

8    BROWN that McCOMB was waiting on a call regarding the 20 pounds

9    of sodium metabisulphite that BROWN had requested.

10         145. On or about April 4, 2011, defendant WILSON, in a

11   telephone conversation using coded language, told defendant

12   BROWN that WILSON was looking for someone to assist in removing

13   chemical waste from a PCP manufacturing site, and BROWN said he

14   knew someone who could assist WILSON and would find out how much

15   that person charged.

16         146. On or about April 4, 2011, defendant THOMAS, in a

17   telephone conversation using coded language, told defendant

18   BROWN that defendant BRACKEN still needed piperidine, and BROWN

19   said he had been looking for piperidine.

20         147. During the same telephone conversation on or about

21   April 4, 2011, defendant THOMAS, using coded language, asked

22   defendant BROWN if BROWN's associate had been to AutoZone yet in

23   order to purchase starter fluid for purposes of extracting

24   ether.

25         148. On or about April 4, 2011, defendants BROWN and

26   WILSON, in a telephone conversation using coded language,

27   discussed piperidine that was available for $5,000 per five-

28   gallon container.

                                35 .

1     149. On or about April 8, 2011, defendant THOMAS, in

2  telephone conversations using coded language, told defendant

3  BROWN that defendant BRACKEN wanted sodium bisulfite.

4     150. On or about April 10, 2011, defendants BROWN and

5  WILSON, in a telephone conversation using coded language,

6  discussed that piperidine was costing them $5,000 per five-

7  gallon container and that this price was high.

8     151. On or about April 11, 2011, defendant MADRID, in a

9  telephone conversation using coded language, told defendant

10  BROWN that MADRID had set aside for BROWN certain PCP-precursor

11  chemicals that were back-ordered at the company where MADRID

12  worked and that the PCP-precursor chemicals would cost BROWN

13  $1,000 per unit.

14     152. During the same telephone conversation on or about

15  April 11, 2011, defendant MADRID, using coded language, told

16  defendant BROWN that BROWN had "shorted" MADRID following their

17  prior PCP-precursor chemical transaction and that BROWN owed

18  MADRID money.

19     153. On or about April 11, 2011, defendants BROWN and

20  THOMAS, in telephone conversations using coded language,

21  discussed obtaining piperidine, that those who had piperidine

22  wanted "top dollar" for it, and that a unit of piperidine cost

23  approximately $5,000.

24     154. On or about April 11, 2011, defendant HESTER, in a

25  telephone conversation using coded language, told a confidential

26  informant that he was going to sell a firearm.

27     155. On or about April 12, 2011, defendants BROWN and

28  JACKSON, in a telephone conversation using coded language,

1   discussed a PCP transaction, and JACKSON said he was on his way

2   to BROWN's location.

3       156. On or about April 14, 2011, defendant THOMAS, in

4   telephone conversations using coded language, told defendant

5   BROWN that defendants BRACKEN and NEPHEW wanted two five-gallon

6   containers of ether, and BROWN agreed to obtain them.

7       157. On or about April 15, 2011, defendant THOMAS put

8   defendant BRACKEN on the telephone with defendant BROWN, and

9   BRACKEN, in a telephone conversation using coded language, asked

10  BROWN about obtaining piperidine, and BROWN said he was working

11  on it.

12      158. During the same telephone conversation on or about

13  April 15, 2011, defendant BRACKEN, using coded language, told

14  defendant BROWN that BRACKEN wanted two or three five-gallon

15  containers of ether.

16      159. During the same telephone conversation on or about

17  April 15, 2011, defendant BROWN, using coded language, asked

18  defendant BRACKEN whether BRACKEN had a gallon of PCP available,

19  and BRACKEN said no, but BRACKEN added that as soon as he

20  obtained the PCP pre-cursor chemicals he had requested from

21  BROWN, BRACKEN would have PCP available for BROWN.

22      160. On or about April 16, 2011, defendant BROWN, in

23  telephone conversations using coded language, asked defendant

24  WILSON if WILSON was able to obtain piperidine, and WILSON said

25  he was waiting to hear back from a source regarding the

26  availability of piperidine.

27      161. On or about April 16, 2011, defendant WILSON, in

28  telephone conversations using coded language, told an unindicted

1  co-conspirator that WILSON always dealt with defendant BROWN in

2  his PCP-related transactions and had never in his life had any

3  problems with BROWN with regard to those transactions.

4      162. On or about April 16, 2011, defendant COMBS, in

5  telephone conversations using coded language, told defendant

6  WILSON that COMBS's drug customer wanted 32 ounces of PCP, and

7  WILSON told COMBS that WILSON's PCP source had no PCP available

8  at that time.

9      163. On or about April 16, 2011, defendant COMBS, in a

10 telephone conversation using coded language, told defendant

11 BROWN that COMBS's drug customer wanted 32 ounces of PCP, and

12 BROWN said he would contact his PCP suppliers to look into the

13 availability of the PCP COMBS wanted for his drug customer.

14     164. On or about April 17, 2011, defendant THOMAS, in a

15 telephone conversation using coded language, told defendant

16 BROWN that THOMAS spoke to a PCP supplier who had 32 ounces of

17 PCP available for sale, and BROWN said he would contact

18 defendant COMBS to arrange the transaction.

19     165. On or about April 17, 2011, defendant BROWN, in a

20 telephone conversation using coded language, told defendant

21 COMBS that the price of the 32 ounces of PCP would be $2,500.

22     166. On or about April 17, 2011, defendants BROWN and

23 COMBS, in telephone conversations using coded language,

24 discussed obtaining a sample of PCP for COMBS's drug customer.

25     167. On or about April 17, 2011, defendant BROWN, in

26 telephone conversations using coded language, told defendant

27 THOMAS that defendant COMBS wanted to get a "sample" of the 32

28 ounces of PCP, and THOMAS agreed to obtain a sample.

168. During the same telephone conversations on or about April 17, 2011, defendants BROWN and THOMAS, using coded language, discussed negotiating the price of the 32 ounces of PCP, and BROWN and THOMAS agreed to meet about the transaction.

169. On or about April 17, 2011, defendant MILES, in a telephone conversation using coded language, asked defendant WILSON at what price WILSON would sell 32 ounces of PCP, and WILSON said that 32 ounces of PCP would cost $3,000.

170. On or about April 17, 2011, defendants WILSON and MILES, in a telephone conversation using coded language, discussed selling 32 ounces of PCP to MILES's drug customers, and MILES said that her drug customers had bought all the PCP that MILES possessed in order to hold them over while they waited for the 32 ounces of PCP.

171. During the same telephone conversation on or about April 17, 2011, defendant MILES, using coded language, ordered a unit of PCP from defendant WILSON, and WILSON said he would be right over to deliver the PCP.

172. On or about April 18, 2011, defendant MILES, in a telephone conversation using coded language, told defendant WILSON that MILES's drug customers were complaining about the price of the PCP MILES was offering to them, and WILSON said PCP was hard to obtain at the moment and that "[t]he whole thing is making money."

173. On or about April 19, 2011, defendant FLANAGAN, in a telephone conversation using coded language, told defendant WILSON that FLANAGAN had a drug customer who wanted PCP so she wanted to know the prices at which WILSON sold PCP, and WILSON

1  advised FLANAGAN that a gallon of PCP would cost $12,000, a
2  half-gallon of PCP would cost $6,000, 32 ounces of PCP would
3  cost $3,000, and 16 ounces of PCP would cost $1,500.

4       174. On or about April 19, 2011, defendant FLANAGAN, in a
5  telephone conversation using coded language, told defendant
6  WILSON to have the PCP ready by the weekend because FLANAGAN's
7  PCP customer worked during the week.

8       175. On or about April 19, 2011, defendant BROWN, in a
9  telephone conversation using coded language, told defendant
10  WILSON that BROWN's drug customer wanted at least three units of
11  piperidine, and WILSON said he would check on the availability
12  of piperidine.

13       176. On or about April 19, 2011, defendant THOMAS put
14  defendant BRACKEN on the telephone with defendant BROWN, and
15  BRACKEN, in a telephone conversation using coded language, asked
16  BROWN if piperidine was available, and BROWN said piperidine was
17  in high demand and that BROWN would contact BRACKEN as soon as
18  piperidine became available.

19       177. On or about April 20, 2011, defendants BROWN and
20  THOMAS, in a telephone conversation using coded language,
21  discussed obtaining a gallon of PCP to broker a PCP transaction,
22  and BROWN said he would inquire to see if they could get a lower
23  price for the PCP.

24       178. On or about April 20, 2011, defendant MADRID, in a
25  telephone conversation using coded language, offered defendant
26  BROWN PCP-precursor chemicals, and BROWN said that he did not
27  have a buyer at this time.

28

179. On or about April 21, 2011, defendant WILSON, in a telephone conversation using coded language, instructed an unindicted co-conspirator on the types of PCP-precursor chemicals that WILSON wanted to obtain, and WILSON told the unindicted co-conspirator to call chemical companies to obtain ether, bromobenzene, or piperidine.

180. On or about April 21, 2011, defendants BROWN and THOMAS, in a telephone conversation using coded language, discussed obtaining a gallon of PCP.

181. On or about April 21, 2011, defendant BROWN, in a telephone conversation using coded language, told defendant WILSON that BROWN wanted a gallon of PCP, and WILSON said he knew somebody who had high quality PCP.

182. On or about April 21, 2011, defendant LEWIS, in a telephone conversation using coded language, told defendant WILSON that LEWIS could obtain a gallon of PCP for WILSON, and WILSON said that the price of the gallon of PCP would need to be $9,000 so that WILSON and LEWIS could make money distributing the PCP.

183. On or about April 21, 2011, defendant WILSON, in a telephone conversation using coded language, told defendant BROWN that WILSON had inquired about the availability of a gallon of PCP and that it would cost $10,000.

184. On or about April 21, 2011, defendant LEWIS, in a telephone conversation using coded language, told defendant WILSON that the gallon of PCP that LEWIS was obtaining for WILSON was almost finished, and LEWIS would let him know later that afternoon when the gallon of PCP would be available.

185. On or about April 21, 2011, defendant LEWIS, in a telephone conversation using coded language, told defendant WILSON that LEWIS had more information regarding the availability of the gallon of PCP that LEWIS was obtaining for WILSON, and LEWIS told WILSON to come pick LEWIS up so that they could discuss the PCP transaction in person.

186. On or about April 21, 2011, defendant BROWN, in a telephone conversation using coded language, asked defendant JACKSON for a gallon of PCP for a PCP transaction that BROWN was brokering, and JACKSON said he would get BROWN a good price for the PCP.

187. On or about April 21, 2011, defendants BROWN and JACKSON, in a telephone conversation using coded language, agreed on a price of $9,500 for a gallon of PCP, and JACKSON said that, at that price, BROWN would be able to profit from the PCP transaction.

188. On or about April 21, 2011, defendant BROWN, in a telephone conversation using coded language, told defendant THOMAS that BROWN had found a gallon of PCP and that the price for the gallon of PCP would be lowered in order for BROWN and THOMAS to profit from the PCP transaction.

189. On or about April 22, 2011, defendant FLANAGAN, in a telephone conversation using coded language, told defendant WILSON that FLANAGAN's drug customer was going to go elsewhere to purchase the PCP, but when WILSON said he would lower the price of a half-gallon of PCP to $5,000, FLANAGAN said she would contact her drug customer to try to carry out a PCP transaction with WILSON.

190. On or about April 22, 2011, defendant BROWN, in a telephone conversation using coded language, told defendant JACKSON that BROWN was ready to carry out the one-gallon PCP transaction, and JACKSON confirmed he was ready as well.

191. On or about April 22, 2011, defendants BROWN and JAMES, in a telephone conversation using coded language, discussed a one-gallon PCP transaction they were brokering for JAMES's drug customers.

192. On or about April 22, 2011, defendant THOMAS, in a telephone conversation using coded language, told defendant BROWN that THOMAS's PCP supplier wanted $10,000 for the gallon of PCP, and BROWN said the supplier would need to lower the price to $9,500 in order for them to make money off of the PCP transaction, and THOMAS agreed.

193. On or about April 22, 2011, defendants BROWN and JAMES, in a telephone conversation using coded language, agreed to meet to carry out the one-gallon PCP transaction they were brokering.

194. On or about April 22, 2011, defendant WILSON, in a telephone conversation using coded language, told defendant BROWN that WILSON could get BROWN a gallon of PCP for $9,000, but BROWN said he had just obtained a gallon of PCP.

195. On or about April 23, 2011, defendant FLANAGAN, in a telephone conversation using coded language, told defendant WILSON that FLANAGAN was still trying to contact her drug customer and that she would contact WILSON once she did because FLANAGAN was trying to "make a little change" out of brokering a PCP transaction with WILSON.

43

196. On or about April 23, 2011, defendant BROWN, in a telephone conversation using coded language, told defendant JAMES that BROWN was ready to carry out the one-gallon PCP transaction, and BROWN and JAMES agreed to meet on Compton Avenue.

197. On or about April 23, 2011, defendant BROWN, in a telephone conversation using coded language, told defendant THOMAS that BROWN was meeting with an unindicted co-conspirator to finalize their one-gallon PCP transaction.

198. During the same telephone conversation on or about April 23, 2011, defendant THOMAS, using coded language, told defendant BROWN that defendant BRACKEN wanted piperidine.

199. During the same telephone conversation on or about April 23, 2011, defendant THOMAS put defendant BRACKEN on the telephone with defendant BROWN, and BRACKEN, using coded language, asked BROWN about the availability of piperidine, and BROWN said that he knew a supplier selling piperidine for $5,500 per five-gallon container, but the price was too high for BROWN to make money from the transaction, and BROWN said he would continue to look for piperidine for BRACKEN.

200. On or about April 23, 2011, defendant BROWN, in a telephone conversation using coded language, inquired with defendant WILSON about the availability of piperidine, and BROWN and WILSON discussed one of WILSON's drug customers who wanted five gallons of piperidine.

201. On or about April 23, 2011, defendant THOMAS, in a telephone conversation using coded language, called defendant BROWN to thank him for assisting in the one-gallon PCP

1   transaction they had brokered, and BROWN responded, "You know,
2   anytime."

3        202. On or about April 29, 2011, defendant THOMAS, in a
4   telephone conversation using coded language, told defendant
5   BROWN that defendant BRACKEN could not find piperidine as good
6   as what defendant MADRID sold, and BROWN said MADRID was on
7   vacation and unavailable, but BROWN would look for the
8   piperidine somewhere else.

9        203. On or about April 29, 2011, defendants BRACKEN and
10  BROWN, in a telephone conversation using coded language,
11  discussed BRACKEN obtaining five units of piperidine from
12  defendant MADRID, and BRACKEN said he only needed four units of
13  piperidine and wanted a better price for the fifth unit.

14       204. On or about April 29, 2011, defendant HOWLETT, in a
15  telephone conversation using coded language, told defendant
16  BROWN that HOWLETT had a drug customer who wanted two five-
17  gallon containers of ether, and BROWN told HOWLETT that each
18  container would cost $2,000.

19       205. On or about April 29, 2011, defendant HOWLETT, in a
20  telephone conversation using coded language, asked defendant
21  BROWN to lower the price of the ether to $1,500 per container.

22       206. On or about April 29, 2011, defendant BROWN, in a
23  telephone conversation using coded language, told defendant
24  HOWLETT that BROWN would be ready with the two five-gallon
25  containers of ether in 45 minutes.

26       207. On or about April 29, 2011, defendants BROWN and
27  HOWLETT, in telephone conversations using coded language,
28  discussed the fact that HOWLETT's drug customer seeking to

obtain ether was the same person for whom defendant THOMAS was brokering an ether transaction that day, and HOWLETT asked BROWN to provide him with some of the drug proceeds from the ether transaction.

208. On or about April 29, 2011, defendant COMBS, in a telephone conversation using coded language, ordered 32 ounces of PCP from defendant BROWN.

209. On or about April 29, 2011, defendant COMBS, in a telephone conversation using coded language, told a confidential informant that COMBS was ready to carry out the 32-ounce PCP transaction.

210. On or about April 29, 2011, defendant BROWN, in a telephone conversation using coded language, discussed with defendant JAMES obtaining 64 ounces of PCP, and JAMES agreed to inquire with others as to the availability of the PCP.

211. On or about April 30, 2011, defendant AUBREY, in a telephone conversation using coded language, told defendant WILSON that AUBREY needed PCP, and WILSON agreed to provide AUBREY with four ounces of PCP.

212. On or about April 30, 2011, defendant WILSON, in a telephone conversation using coded language, asked defendant MILES to find him someone who could sample the quality of PCP WILSON had, and MILES said she could get someone.

213. On or about April 30, 2011, defendant AUBREY, in a telephone conversation using coded language, complained to defendant WILSON about the quality of PCP that WILSON had previously supplied to AUBREY, and AUBREY said drug customers

brought the PCP back to her and she had to give them back their money.

214. During the same telephone conversation on or about April 30, 2011, defendant WILSON, using coded language, told defendant AUBREY to provide him with gas money so that WILSON could deliver PCP to AUBREY, and AUBREY agreed to do so.

215. On or about May 1, 2011, defendant WILSON, in a telephone conversation using coded language, told defendant COMBS that WILSON had PCP available, and COMBS said that he would contact WILSON.

216. On or about May 2, 2011, defendants BROWN and PRUDHOLME JR., in a telephone conversation using coded language, discussed preparing containers of ether using starter fluid, and PRUDHOLME JR. said he would prepare the ether at the house of the mother of his child.

217. On or about May 2, 2011, defendant THOMAS, in a telephone conversation using coded language, told defendant BROWN that there had been a problem with a batch of PCP that defendant BRACKEN was manufacturing, and BROWN said maybe the problem was with the PCC.

218. On or about May 2, 2011, defendant WILSON, in a telephone conversation using coded language, asked defendant COMBS if he was going to pick up PCP from WILSON, and COMBS said he would contact WILSON.

219. On or about May 5, 2011, defendants BROWN and WILSON, in a telephone conversation using coded language, discussed going to see a person who had PCP ready for sale.

220. On or about May 5, 2011, defendant BROWN, in a telephone conversation using coded language, told defendant PRUDHOLME JR. that BROWN had given PRUDHOLME JR. enough money to purchase sufficient cans of starter fluid to prepare two five-gallon containers of ether.

221. On or about May 5, 2011, defendants BROWN and PRUDHOLME JR., in a telephone conversation using coded language, discussed preparing five-gallon containers of ether that day.

222. On or about May 7, 2011, defendant BROWN, in a telephone conversation using coded language, inquired with defendant JAMES about whether JAMES could obtain PCP in 16-ounce quantities, and, when JAMES said that he could do so, BROWN said he would contact defendant WILSON to let him know.

223. On or about May 7, 2011, defendants BROWN and WILSON, in a telephone conversation using coded language, discussed the availability of 16 ounces of PCP, and WILSON asked BROWN to find out what the price would be for 16 ounces of PCP, which BROWN agreed to do.

224. On or about May 7, 2011, defendant MILES, in a telephone conversation using coded language, ordered from defendant WILSON one ounce of PCP, and WILSON said the PCP was "super fire," meaning it was of high quality.

225. On or about May 8, 2011, defendant JAMES, in a telephone conversation using coded language, told defendant BROWN that JAMES wished to acquire a PCP-precursor chemical for an unindicted co-conspirator, and BROWN agreed to look for the PCP-precursor chemical for JAMES.

226. On or about May 10, 2011, defendants BROWN and JAMES, in a telephone conversation using coded language, discussed brokering a transaction for 32 ounces of PCP.

227. On or about May 10, 2011, defendant BROWN, in a telephone conversation using coded language, told defendant COMBS that 32 ounces of PCP would cost $2,500, and COMBS inquired if that was the same price BROWN charged COMBS during a prior PCP transaction, but BROWN said that he could not remember.

228. During the same telephone conversation on or about May 10, 2011, defendants BROWN and COMBS, using coded language, discussed carrying out the 32-ounce PCP transaction, and BROWN said that his PCP suppliers did not like carrying out PCP transactions close to nighttime.

229. On or about May 10, 2011, defendant WILSON, in a telephone conversation using coded language, told defendant MILES that WILSON was concerned that undercover officers or the FBI were following him.

230. On or about May 11, 2011, defendant JAMES, in a telephone conversation using coded language, discussed with defendant BROWN sending one or two gallons of PCP to defendant AUSTIN in Dallas, Texas, and BROWN said he would contact AUSTIN.

231. On or about May 11, 2011, defendant BROWN, in a telephone conversation using coded language, told defendant AUSTIN that defendant JAMES had said that AUSTIN needed PCP and that defendant HAWKINS would be sending AUSTIN two gallons of PCP at a good price, and AUSTIN confirmed he understood this.

232. On or about May 11, 2011, defendant JACKSON, in a telephone conversation using coded language, asked defendant BROWN for 64 ounces of PCP, and BROWN said the price would be half the price charged for a gallon of PCP, or approximately $4,750.

233. During the same telephone conversation on or about May 11, 2011, defendant BROWN, using coded language, told defendant JACKSON that JACKSON's PCP customers could test the quality of the 64 ounces of PCP before making the purchase.

234. On or about May 11, 2011, defendant THOMAS, in a telephone conversation using coded language, told defendant BROWN that defendant NEPHEW wanted to get a five-gallon container of ether from BROWN.

235. During the same telephone conversation on or about May 11, 2011, defendant THOMAS put defendant NEPHEW on the telephone with defendant BROWN, and NEPHEW, using coded language, told BROWN that he wanted to pick up a five-gallon container of ether from BROWN.

236. On or about May 11, 2011, defendant THOMAS, in a telephone conversation using coded language, told defendant BROWN that defendant BRACKEN wanted three five-gallon containers of ether.

237. During the same telephone conversation on or about May 11, 2011, defendant THOMAS put defendant BRACKEN on the telephone with defendant BROWN, and BRACKEN, using coded language, told BROWN that he needed three five-gallon containers of ether, and BROWN said he would get them for BRACKEN.

1      238. On or about May 12, 2011, defendant ROBINSON, in a
2  telephone conversation using coded language, told defendant
3  WILSON that ROBINSON wanted to pick up 16 ounces of PCP from
4  WILSON.

5      239. On or about May 12, 2011, defendant PRUDHOLME JR., in
6  a telephone conversation using coded language, told defendant
7  BROWN that PRUDHOLME JR. was ready to prepare five-gallon
8  containers of ether.

9      240. On or about May 12, 2011, defendant THOMAS put
10  defendant NEPHEW on the telephone with defendant BROWN, and
11  BROWN, in a telephone conversation using coded language, told
12  NEPHEW that BROWN had two five-gallon containers of ether and
13  was waiting on one additional five-gallon container of ether,
14  and NEPHEW said he was going to pick up the containers from
15  BROWN on behalf of defendant BRACKEN.

16      241. On or about May 12, 2011, defendant NEPHEW, in a
17  telephone conversation using coded language, told defendant
18  BROWN that he would pick up the three five-gallon containers of
19  ether from BROWN the next morning and would provide payment to
20  BROWN.

21      242. On or about May 12, 2011, defendant JACKSON, in a
22  telephone conversation using coded language, told defendant
23  WILSON that JACKSON had a drug customer who wanted PCP, and
24  WILSON agreed to look for PCP for JACKSON to sell to his drug
25  customer.

26      243. On or about May 12, 2011, defendant MILES, in a
27  telephone conversation using coded language, asked defendant

28

1  WILSON for the price of 16 ounces of PCP, and WILSON said the
2  price would be $1,400.

3      244. On or about May 12, 2011, defendants WILSON and
4  AUBREY, in a telephone conversation using coded language,
5  discussed providing AUBREY with PCP, and AUBREY told WILSON that
6  she was trying to make money by distributing the PCP and that
7  the quality of the PCP had to be good.

8      245. On or about May 12, 2011, defendant ROBINSON, in a
9  telephone conversation using coded language, told defendant
10 WILSON that ROBINSON had $1,500 ready to pay for the 16 ounces
11 of PCP he had ordered from WILSON, and WILSON said that he was
12 trying to help ROBINSON make money.

13     246. On or about May 13, 2011, defendants BROWN and JAMES,
14 in a telephone conversation using coded language, discussed
15 carrying out a transaction for 32 ounces of PCP that day.

16     247. On or about May 13, 2011, defendant NEPHEW, in a
17 telephone conversation using coded language, told defendant
18 BROWN that defendant JAMES would provide BROWN with part of the
19 payment for the three five-gallon containers of ether because
20 JAMES owed drug proceeds to defendant BRACKEN.

21     248. On or about May 13, 2011, defendant NEPHEW put
22 defendant BRACKEN on the telephone with defendant BROWN, and
23 BRACKEN, in a telephone conversation using coded language, told
24 BROWN that BRACKEN would pay BROWN $2,500 of the $4,500 for the
25 three five-gallon containers of ether and that defendant JAMES
26 would pay BROWN the remaining $2,000 because JAMES owed BRACKEN
27 $10,000 in drug proceeds.

28

249. On or about May 13, 2011, defendant NEPHEW, in a telephone conversation using coded language, told defendant BROWN that NEPHEW was in Compton, California, and BROWN and NEPHEW arranged to meet so that NEPHEW could pick up, on behalf of defendant BRACKEN, the three five-gallon containers of ether from BROWN.

250. On or about May 13, 2011, defendant WILSON, in a telephone conversation using coded language, told defendant AUBREY that WILSON would have the PCP that he was delivering to AUBREY in his possession soon.

251. On or about May 14, 2011, defendant WILSON, in a telephone conversation using coded language, told defendant AUBREY that WILSON would be delivering three ounces of PCP to her and that she would be covered for two of the ounces of PCP and owe him later for the third ounce of PCP.

252. During the same telephone conversation on or about May 14, 2011, defendant WILSON, using coded language, told defendant AUBREY that the PCP he was delivering to her was of high quality.

253. On or about May 14, 2011, defendant WILSON, in a telephone conversation using coded language, told defendant ROBINSON that the 16 ounces of PCP that WILSON had for ROBINSON was the "bomb," meaning it was of high quality.

254. On or about May 15, 2011, defendants WILSON and ROBINSON, in a telephone conversation using coded language, discussed meeting that day so that ROBINSON could pick up 16 ounces of PCP from WILSON.

1    255. On or about May 17, 2011, defendant AUBREY possessed
2  approximately three ounces, that is, approximately 85 grams, of
3  a mixture or substance containing a detectable amount of PCP, on
4  her person and at her residence located at 1006 North Magnolia
5  Avenue, in Rialto, California.

6    256. On or about September 9, 2011, defendant BRACKEN and a
7  confidential informant posing as a PCP customer discussed, in a
8  telephone conversation using coded language, the prospective
9  sale of a gallon of PCP to the confidential informant the
10 following week by defendant NEPHEW, one of BRACKEN's PCP
11 distributors.

12   257. On or about September 9, 2011, defendant E. BRANCH, in
13 a telephone conversation using coded language, told a
14 confidential informant posing as a PCP customer that 64 ounces
15 of PCP would cost between $4,500 and $5,000, and E. BRANCH
16 agreed to carry out the PCP transaction the following Thursday
17 (September 15, 2011).

18   258. On or about September 13, 2011, defendant BRACKEN and
19 others known and unknown to the Grand Jury distributed to a
20 confidential informant posing as a PCP customer approximately
21 one gallon, that is, approximately 3.7 kilograms, of a mixture
22 or substance containing a detectable amount of PCP, in exchange
23 for $10,000.

24   259. On or about September 15, 2011, defendant E. BRANCH,
25 in a conversation using coded language, told a confidential
26 informant posing as a PCP customer that E. BRANCH would go to
27 obtain the 64 ounces of PCP previously ordered by the
28 confidential informant on or about September 9, 2011.

54

260. On or about September 15, 2011, defendant E. BRANCH distributed to a confidential informant posing as a PCP customer approximately 64 ounces, that is, approximately 1.8 kilograms, of a mixture or substance containing a detectable amount of PCP, in exchange for $5,000.

261. On or about November 25, 2011, defendants BRACKEN and JONES, in a telephone conversation using coded language, discussed JONES's frustration with attempting to manufacture PCP, and BRACKEN provided JONES with instructions on how to manufacture PCP.

262. On or about November 29, 2011, defendants BRACKEN and JONES, in a telephone conversation using coded language, discussed JONES flying to Los Angeles, California, from New York, New York, to obtain five gallons of PCP from BRACKEN.

263. During the same telephone conversation on or about November 29, 2011, defendants BRACKEN and JONES, using coded language, discussed their mutual efforts to manufacture PCP, and BRACKEN said that he was seeking to acquire ether to complete a batch of PCP he was making.

264. On or about November 30, 2011, defendant BRACKEN, in a telephone conversation using coded language, instructed defendant JONES on how to manufacture PCP, and JONES stated that he was in the process of manufacturing a seven- to eight-gallon batch of PCP.

265. On or about November 30, 2011, defendants BRACKEN and JONES and an unidentified co-conspirator, in a telephone conversation using coded language, discussed JONES's and the

1  unindicted co-conspirator's difficulty manufacturing high
2  quality PCP.

3      266. On or about December 1, 2011, defendants BRACKEN and
4  JONES and an unindicted co-conspirator, in a telephone
5  conversation using coded language, discussed JONES's and the
6  unindicted co-conspirator's difficulty manufacturing high
7  quality PCP, and BRACKEN told JONES to set his PCP to the side
8  as BRACKEN would be manufacturing PCP to provide to JONES and
9  the unindicted co-conspirator.

10     267. On or about December 1, 2011, defendants BRACKEN and
11 JONES, in a telephone conversation using coded language,
12 discussed JONES's flight from New York, New York, to Los
13 Angeles, California, the following day, and BRACKEN assured
14 JONES that BRACKEN would be able to provide JONES with high
15 quality PCP.

16     268. On or about December 2, 2011, defendant JONES flew
17 from New York, New York to Los Angles, California to obtain PCP
18 from defendant BRACKEN.

19     269. On or about December 4, 2011, defendant BRACKEN, in a
20 telephone conversation using coded language, told defendant
21 JONES that BRACKEN was waiting to obtain ether in order to
22 complete a batch of PCP to provide to JONES.

23     270. On or about December 5, 2011, defendant BRACKEN, in a
24 telephone conversation using coded language, told defendant
25 JONES that BRACKEN was in the process of completing a batch of
26 PCP, and JONES said that he wanted to obtain the PCP before 3:00
27 p.m. the next day in order to ship the PCP to New York, New York
28 via Federal Express.

1    271. On or about December 6, 2011, defendants BRACKEN and

2    JONES, in a telephone conversation using coded language,

3    arranged to meet that day in Carson, California, so that BRACKEN

4    could provide PCP to JONES.

5        272. On or about December 6, 2011, defendant BRACKEN

6    distributed approximately 7 gallons, that is, approximately 25.9

7    kilograms, of a mixture or substance containing a detectable

8    amount of PCP in Carson, California.

9        273. On or about December 6, 2011, defendant JONES

10   possessed with intent to distribute approximately 7 gallons,

11   that is, approximately 25.9 kilograms, of a mixture or substance

12   containing a detectable amount of PCP in Carson, California.

13       274. On or about December 7, 2011, defendant BRACKEN, in a

14   telephone conversation using coded language, discussed with an

15   unindicted co-conspirator arranging to retain an attorney for

16   defendant JONES following officers' discovery of the 7 gallons

17   of PCP that BRACKEN had placed inside JONES's vehicle.

18       275. On or about December 7, 2011, defendant BRACKEN

19   possessed, inside a residence located at 1723 Cyrene, in Carson,

20   California, approximately 11.7 gallons, that is, approximately

21   43.2 kilograms, of a mixture or substance containing a

22   detectable amount of PCP.

23       276. On or about December 7, 2011, defendant BRACKEN

24   possessed, inside a residence located at 1723 Cyrene, in Carson,

25   California, PCP-precursor chemicals, including approximately six

26   gallons of ethyl ether, 30 pounds of sodium bisulfite, four

27   pounds of cyanide, five pounds of metabisulphite, and magnesium

28   turnings, as well as other items used in the manufacture and

distribution of PCP, including a red plastic funnel, plastic containers, approximately 100 one-gallon paint cans, and a commercial grade, automatic paint can sealer.

277. On or about December 7, 2011, defendant BRACKEN possessed, inside a residence located at 6753 Blue Rose Lane, in Oak Hills, California, approximately one gallon, that is, approximately 3.7 kilograms, of a mixture or substance containing a detectable amount of PCP.

278. On or about December 7, 2011, defendant BRACKEN possessed, inside a residence located at 6753 Blue Rose Lane, in Oak Hills, California, PCP-precursor chemicals, including approximately four pounds of PCC crystals (which can be used to manufacture approximately five gallons of finished PCP), approximately 25 one-gallon containers of sodium cyanide, iodine crystals, and magnesium turnings, as well as other items used in the manufacture and distribution of PCP, including one air purifying respirator and numerous plastic containers.

279. On or about December 7, 2011, defendant BRACKEN possessed, inside a residence located at 6753 Blue Rose Lane, in Oak Hills, California, a firearm, namely, a loaded Springfield Armory model 1911-A1, .45 Auto caliber semiautomatic pistol, bearing serial number NM65236, and approximately $10,050 in drug proceeds.

COUNT TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(iv)]

On or about December 16, 2008, in Los Angeles County, within the Central District of California, defendants ELIGIN GARY HAWKINS, also known as ("aka") "Che-Che," aka "Dub," and OLLIE LEE WADE knowingly and intentionally distributed at least 100 grams, that is, approximately 453.6 grams, of a mixture or substance containing a detectable amount of phencyclidine (PCP), a Schedule II controlled substance.

COUNT THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iv)]

On or about March 12, 2009, in Los Angeles County, within the Central District of California, defendants ANTHONY WILSON, also known as "Ankey," and DANA MILES knowingly and intentionally possessed with intent to distribute at least one kilogram, that is, approximately 25.9 kilograms, of a mixture or substance containing a detectable amount of phencyclidine (PCP), a Schedule II controlled substance.

COUNT FOUR

[21 U.S.C. § 856(a)]

Beginning on a date unknown and continuing to on or about March 12, 2009, in Los Angeles County, within the Central District of California, defendants ANTHONY WILSON, also known as "Ankey," and DANA MILES knowingly and intentionally opened, leased, rented, used, and maintained, and managed and controlled, as an owner, lessee, agent, employee, occupant, and mortgagee, and knowingly and intentionally rented, leased, profited from, and made available for use, a place located at 226 Cambridge Street, in Long Beach, California, for the purpose of unlawfully manufacturing, storing, and distributing phencyclidine (PCP), a Schedule II controlled substance.

COUNT FIVE

[21 U.S.C. § 841(c)(1)]

On or about August 18, 2009, in Los Angeles County, within the Central District of California, defendant NORMAN MANGRAM, also known as ("aka") "Desvignes Norman," aka "Storm," knowingly and intentionally possessed approximately 255 grams of piperidine, a List I chemical, with the intent to manufacture a controlled substance, that is, phencyclidine (PCP), a Schedule II controlled substance.

COUNT SIX

[21 U.S.C. § 841(c)(2)]

On or about August 18, 2009, in Los Angeles County, within the Central District of California, defendant NORMAN MANGRAM, also known as ("aka") "Desvignes Norman," aka "Storm," knowingly and intentionally possessed approximately 255 grams of piperidine, a List I chemical, knowing and having reasonable cause to believe that it would be used to manufacture a controlled substance, that is, phencyclidine (PCP), a Schedule II controlled substance.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUNT SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(iv)]

On or about January 26, 2011, in Los Angeles County, within the Central District of California, defendants ANDRE BROWN, also known as ("aka") "Dre," aka "Gay Dre," aka "King Dre," and DELL HESTER, aka "Boo Boo," knowingly and intentionally distributed at least 100 grams, that is, approximately 907.2 grams, of a mixture or substance containing a detectable amount of phencyclidine (PCP), a Schedule II controlled substance.

COUNT EIGHT

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about May 17, 2011, in San Bernardino County, within the Central District of California, defendant PATRICIA AUBREY knowingly and intentionally possessed with intent to distribute approximately 85 grams of a mixture or substance containing a detectable amount of phencyclidine (PCP), a Schedule II controlled substance.

COUNT NINE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iv)]

On or about September 13, 2011, in Los Angeles County, within the Central District of California, defendant ANTHONY DWIGHT BRACKEN, also known as ("aka") "Fat Boy," aka "Unc," aka "Daddy-O," knowingly and intentionally distributed at least one kilogram, that is, approximately 3.7 kilograms, of a mixture or substance containing a detectable amount of phencyclidine (PCP), a Schedule II controlled substance.

COUNT TEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iv)]

On or about September 15, 2011, in Los Angeles County, within the Central District of California, defendant EDWARD KEVIN BRANCH, also known as ("aka") "Bo," aka "Bohart," knowingly and intentionally distributed at least one kilogram, that is, approximately 1.8 kilograms, of a mixture or substance containing a detectable amount of phencyclidine (PCP), a Schedule II controlled substance.

1

COUNT ELEVEN

2

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iv)]

3

On or about December 6, 2011, in Los Angeles County, within

4 the Central District of California, defendant ANTHONY DWIGHT

5 BRACKEN, also known as ("aka) "Fat Boy," aka "Unc," aka "Daddy-

6 O," knowingly and intentionally distributed at least one

7 kilogram, that is, approximately 25.9 kilograms, of a mixture or

8 substance containing a detectable amount of phencyclidine (PCP),

9 a Schedule II controlled substance.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT TWELVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iv)]

On or about December 6, 2011, in Los Angeles County, within the Central District of California, defendant STAN JONES knowingly and intentionally possessed with intent to distribute at least one kilogram, that is, approximately 25.9 kilograms, of a mixture or substance containing a detectable amount of phencyclidine (PCP), a Schedule II controlled substance.

COUNT THIRTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iv)]

On or about December 7, 2011, in Los Angeles County, within the Central District of California, defendant ANTHONY DWIGHT BRACKEN, also known as ("aka) "Fat Boy," aka "Unc," aka "Daddy-O," knowingly and intentionally possessed with intent to distribute at least one kilogram, that is, approximately 43.2 kilograms, of a mixture or substance containing a detectable amount of phencyclidine (PCP), a Schedule II controlled substance.

## COUNT FOURTEEN

[21 U.S.C. § 856(a)]

Beginning on a date unknown and continuing to on or about December 7, 2011, in Los Angeles County, within the Central District of California, defendant ANTHONY DWIGHT BRACKEN, also known as ("aka) "Fat Boy," aka "Unc," aka "Daddy-O," knowingly and intentionally opened, leased, rented, used, and maintained, and managed and controlled, as an owner, lessee, agent, employee, occupant, and mortgagee, and knowingly and intentionally rented, leased, profited from, and made available for use, a place located at 1723 Cyrene, in Carson, California, for the purpose of unlawfully manufacturing, storing, and distributing phencyclidine (PCP), a Schedule II controlled substance.

COUNT FIFTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iv)]

On or about December 7, 2011, in San Bernardino County, within the Central District of California, defendant ANTHONY DWIGHT BRACKEN, also known as ("aka") "Fat Boy," aka "Unc," aka "Daddy-O," knowingly and intentionally possessed with intent to distribute at least one kilogram, that is, approximately 3.7 kilograms, of a mixture or substance containing a detectable amount of phencyclidine (PCP), a Schedule II controlled substance.

COUNT SIXTEEN

[21 U.S.C. § 856(a)]

Beginning on a date unknown and continuing to on or about December 7, 2011, in San Bernardino County, within the Central District of California, defendant ANTHONY DWIGHT BRACKEN, also known as ("aka) "Fat Boy," aka "Unc," aka "Daddy-O," knowingly and intentionally opened, leased, rented, used, and maintained, and managed and controlled, as an owner, lessee, agent, employee, occupant, and mortgagee, and knowingly and intentionally rented, leased, profited from, and made available for use, a place located at 6753 Blue Rose Lane, in Oak Hills, California, for the purpose of unlawfully manufacturing, storing, and distributing phencyclidine (PCP), a Schedule II controlled substance.

COUNT SEVENTEEN

[18 U.S.C. § 924(c)(1)(A)]

On or about December 7, 2011, in San Bernardino County, within the Central District of California, defendant ANTHONY DWIGHT BRACKEN, also known as ("aka") "Fat Boy," aka "Unc," aka "Daddy-O," knowingly possessed a firearm, namely, a loaded Springfield Armory model 1911-A1, .45 Auto caliber semiautomatic pistol, bearing serial number NM65236, in furtherance of drug trafficking crimes, namely, conspiracy to manufacture, distribute, and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846, possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(iv), and maintaining drug-involved premises, in violation of Title 21, United States Code, Section 856(a), as charged in Counts One, Fifteen, and Sixteen of this Indictment.

COUNT EIGHTEEN

[18 U.S.C. § 922(g)(1)]

On or about December 7, 2011, in San Bernardino County, within the Central District of California, defendant ANTHONY DWIGHT BRACKEN, also known as ("aka") "Fat Boy," aka "Unc," aka "Daddy-O" ("BRACKEN"), knowingly possessed a firearm, namely, a Springfield Armory model 1911-A1, .45 Auto caliber semiautomatic pistol, bearing serial number NM65236; and ammunition, namely, two rounds of Arms Corporation .45 Auto caliber ammunition and one round of Poongsan Corporation .45 Auto caliber ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant BRACKEN had been convicted of at least one of the following felony crimes, each punishable by a term of imprisonment exceeding one year:

(1) Burglary, in violation of California Penal Code Section 459, in the Superior Court of the State of California, County of Los Angeles, case number A464053, on or about March 6, 1985;

(2) Burglary, in violation of California Penal Code Section 459, in the Superior Court of the State of California, County of Los Angeles, case number A464053, on or about March 6, 1985;

(3) Receiving Stolen Property, in violation of California Penal Code Section 496, in the Superior Court of the State of California, County of Los Angeles, case number A030286, on or about May 5, 1985;

(4) Burglary, in violation of California Penal Code Section 459, in the Superior Court of the State of California, County of Los Angeles, case number A635357, on or about March 14, 1986;

1    (5) Burglary, in violation of California Penal Code Section
2  459, in the Superior Court of the State of California, County of
3  Los Angeles, case number NA003452, on or about August 6, 1990;
4    (6) Receiving Stolen Property, in violation of California
5  Penal Code Section 496, in the Superior Court of the State of
6  California, County of Los Angeles, case number NA003452, on or
7  about August 6, 1990;
8    (7) Felon in Possession of a Firearm, in violation of
9  California Penal Code Section 12021, in the Superior Court of
10  the State of California, County of Los Angeles, case number
11  TA014576, on or about September 20, 1991;
12    (8) Obtaining Telephone Services by Fraud, in violation of
13  California Penal Code Section 502.7, in the Superior Court of
14  the State of California, County of Los Angeles, case number
15  NA028760, on or about April 14, 1997;
16    (9) Theft of Access Cards or Account Information, in
17  violation of California Penal Code Section 484E, in the Superior
18  Court of the State of California, County of Los Angeles, case
19  number TA054363, on or about March 6, 2000;
20    (10) Felon in Possession of a Firearm, in violation of
21  California Penal Code Section 12021, in the Superior Court of
22  the State of California, County of San Bernardino, case number
23  FVI800037, on or about October 14, 2008.
24
25
26
27
28

FORFEITURE ALLEGATION ONE

[21 U.S.C. § 853]

1.    Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 21, United States Code, Section 853, in the event of any defendant's conviction under any of Counts One through Sixteen of this Indictment.

2.    Each defendant convicted under any of Counts One through Sixteen shall forfeit to the United States the following property:

        a.    All right, title, and interest in any and all property, real or personal - - (i) constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of any offense set forth in any of Counts One through Sixteen of this Indictment; and (ii) used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of any offense set forth in any of Counts One through Sixteen of this Indictment; and

        b.    A sum of money equal to the total value of the property described in paragraph 2.a.  For each of Counts One through Sixteen for which more than one defendant is found guilty, each such defendant shall be jointly and severally liable for the entire amount ordered forfeited pursuant to that Count.

3.    Pursuant to Title 21, United States Code, Section 853(p), each defendant shall forfeit substitute property, up to the value of the total amount described in the preceding

1   paragraph, if, as the result of any act or omission of said
2   defendant, the property described in the preceding paragraph, or
3   any portion thereof (a) cannot be located upon the exercise of
4   due diligence; (b) has been transferred, sold to, or deposited
5   with a third party; (c) has been placed beyond the jurisdiction
6   of the court; (d) has been substantially diminished in value; or
7   (e) has been commingled with other property that cannot be
8   divided without difficulty.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant ANTHONY DWIGHT BRACKEN, also known as ("aka") "Fat Boy," aka "Unc," aka "Daddy-O" ("BRACKEN"), that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 924(d), and Title 28, United States Code, Section 2461(c), in the event of defendant BRACKEN's conviction under either of Counts Seventeen and Eighteen of this Indictment.

2.    Upon defendant BRACKEN's conviction under either of Counts Seventeen and Eighteen of this Indictment, defendant BRACKEN shall forfeit to the United States any firearms and ammunition involved in or used in the knowing commission of either offense set forth in either of Counts Seventeen or Eighteen of this Indictment, including, but not limited to: (i) one Springfield Armory model 1911-A1, .45 Auto caliber semiautomatic pistol, bearing serial number NM65236; (ii) two rounds of Arms Corporation .45 Auto caliber ammunition; and (iii) one round of Poongsan Corporation .45 Auto caliber ammunition.

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), defendant BRACKEN shall forfeit substitute property, up to the value of the property described in the preceding paragraph, if, as the result of any act or omission of defendant BRACKEN, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of

1   due diligence; (b) has been transferred, sold to, or deposited

2   with a third party; (c) has been placed beyond the jurisdiction

3   of the court; (d) has been substantially diminished in value; or

4   (e) has been commingled with other property that cannot be

5   divided without difficulty.

6

7                                    A TRUE BILL

8

9                                    /S/
                                    _____
10                                   Foreperson

11  ANDRÉ BIROTTE JR.
    United States Attorney
12
13

14  ROBERT E. DUGDALE
    Assistant United States Attorney
15  Chief, Criminal Division

16

17  ELIZABETH R. YANG
    Assistant United States Attorney
18  Chief, Violent & Organized Crime Section

19  E. MARTIN ESTRADA
    TERRENCE P. MANN
20  NICHOLAS A. TRUTANICH
    Assistant United States Attorneys
21  Violent & Organized Crime Section

22

23

24

25

26

27

28